OPINION OF THE COURT
Bernard Fuchs, J.
The basis of this holdover proceeding is that respondent’s rent-controlled apartment is allegedly not her primary residence. At the threshold, respondent moves to dismiss the petition for lack of "subject matter jurisdiction”.
An offering statement or prospectus for conversion of the *495 building to cooperative ownership was accepted for filing by the Attorney-General on May 28, 1987. The offering was on a noneviction basis and provided a 90-day period, now expired, during which tenants had an exclusive right to buy their respective apartments. Respondent has not bought. This proceeding was commenced in October 1986 after circulation to tenants of a preliminary prospectus or "red herring”.
General Business Law § 352-eeee (2) (c) (ii) mandates (with exceptions not presently pertinent) that no eviction proceeding "be commenced at any time against non-purchasing tenants for failure to purchase or any other reason applicable to expiration of tenancy”. The statute on which petitioner relies is the New York City Rent and Rehabilitation Law (Administrative Code of City of New York § Y51-3.0 [renum § 26-0403]), as amended by the Omnibus Housing Act of 1983 (OHA-83) (L 1983, ch 403, § 42). That provision excludes from rent control a housing accommodation "not occupied by the tenant * * * as his primary residence”.
The issue is whether respondent’s status as a nonpurchasing tenant requires dismissal of the petition. That issue does not touch upon the court’s jurisdiction to entertain this proceeding which is simply for possession of an apartment. (See, CCA 204.)
Read literally, the General Business Law excludes this case from its coverage. A nonpurchasing tenant is one "who has not purchased under the plan”. (General Business Law § 352-eeee [1] [e].) When this proceeding was brought, only a "red herring” had been circulated and there was no plan in effect. (See, General Business Law § 352-e.) It could not, therefore, have been "commenced” against a nonpurchasing tenant. Neither could the reason for the proceeding have been "failure to purchase”. (General Business Law § 352-eeee [2] [c] [ii].) With no plan in effect, respondent was not free to purchase when the proceeding was brought and could not, therefore, have failed to purchase.
Nor was the proceeding brought for "any other reason applicable to expiration of tenancy”. (General Business Law § 352-eeee [2] [c] [ii].) In general, the theory of a holdover is the expiration or termination of a tenancy or right to occupy. (RPAPL 711.) Under General Business Law § 352-eeee (2) (c) (ii), however, the expiration must be of a kind related to "failure to purchase” which it is not in the present case. This reading is required by ejusdem generis, the applicable canon of *496 construction. (See, McKinney’s Cons Laws of NY, Book 1, Statutes § 239.)
When the prospectus offers a noneviction plan, as in this case, moreover, the General Business Law expressly extends the protection of rent control and rent stabilization to nonpurchasing tenants of accommodations already subject to those laws. Section 352-eeee (2) (c) (iii) provides that such dwelling units "shall continue to be subject thereto” after conversion of the building to cooperative ownership. There is thus no reason to believe that rent control (including all the limitations and restrictions on its protection) is ever suspended for a moment by the mere filing of an offering statement.
Dismissal of the petition on the grounds advocated by respondent would endow her with a perpetual tenancy exempt from the limitations on her tenure set forth in the Administrative Code of the City of New York as amended by OHA-83 merely because a cooperative offering plan has been filed. Such a result could not have been intended by the Legislature and should not be read into the statute when it is not compelled by express language. (See, Tower 53 Assocs. v Bennett, 127 Misc 2d 666 [Civ Ct, NY County 1985], revd on other grounds 133 Misc 2d 801 [App Term, 1st Dept 1986]; cf., 58 W. 58th St. Tenant Assn. v 58 W. 58th St. Assocs., 126 Misc 2d 500 [Sup Ct, NY County 1984].) Respondent’s motion is denied.
On the merits, the parties have stipulated to the facts. In July 1969, respondent rented apartment 3B. The following September, Robert Smith rented apartment I. On August 15, 1971, they were married and respondent changed her name on all her official records.
After her marriage, respondent retained apartment 3B. She paid the rent with checks bearing her maiden name and mailed them in envelopes separate from those carrying the rent checks from Mr. and Mrs. Smith for apartment I. The mailbox for apartment 3B retained the name Sijacki, not Smith, but respondent registered to vote as Diane Smith of apartment I.
Respondent did not tell petitioner that she was married to Mr. Smith and they were living together. She did inform petitioner’s predecessor in interest, however, by a letter dated December 16, 1977, that she was married but that she still "maintained apartment 3B as my primary residence both prior to and after my marriage”. Petitioner acquired the property in September 1985. It has never waived its right to *497 require that respondent occupy the apartment only as her primary residence.
The building is a five-story brownstone walk-up measuring 18 feet by 50 feet. There is one apartment on each of the lower two floors and the remaining floors have two apartments each. Apartment I has four rooms consisting of a 20-foot by 12-foot living room, a kitchen and bathroom measuring 6 feet by 5 feet each, a bedroom and den measuring 15 feet by 8V2 feet and 18 feet by 9 feet, respectively, and two 6-foot by 3-foot closets. It covers an area of 726 square feet.
Apartment 3B has three rooms on the third floor; a 15-foot by 12-foot living room, an 18-foot by 6-foot bedroom, a kitchen and bath measuring 6 feet by 4 Vi feet each and two closets, one 3 feet by 3 feet and the other 3 feet by 2 feet. Its total area is 408 square feet.
The two apartments are separated by 50 feet of stairs. Respondent sleeps in apartment I. Upon arising each weekday she goes immediately to apartment 3B where she showers, dresses, makes coffee and prepares for work. Her husband conducts corresponding activities in apartment I to which respondent returns at 7:00 a.m. There they have coffee together and remain until they leave for work.
Upon returning from work at 4:30 p.m. respondent goes directly to 3B. There she changes clothes and remains to read, paint or telephone until 6:30 p.m. when she descends to apartment I. Respondent spends the rest of the evening preparing for dinner, dining out or relaxing in apartment I with her husband until 10:00 p.m. Her husband then uses apartment 3B for two hours to read mail and periodicals and prepare correspondence for the next day. He keeps all his personal and business files in 3B.
On weekends respondent spends afternoons in apartment 3B, painting, drawing, listening to music and doing household chores. When her husband travels on business, about 50 weekdays a year, she sleeps there because it is more secure from intruders than the first floor.
Apartment 3B also serves as a guest room. The couple’s out-of-season clothes are kept there as well as respondent’s art supplies, easel, drafting table and art chair. The apartment is furnished to her personal tastes and she maintains a telephone there under her maiden name.
The Legislature has provided no guidance as to what constitutes a primary residence. That is, however, a term in com *498 mon use and the facts may be measured against its conventional meaning. The primary dictionary definitions of "primary” are "first or highest in rank or importance; chief; principal * * * first in order in any series, sequence, etc.” (Random House Dictionary of English Language [2d ed 1987].)
There is no doubt that when respondent rented apartment 3B in 1969 it was her primary, if not only, apartment. It does not appear to be argued that her marriage and cohabitation with a husband who also has an apartment, ipso facto relegated 3B to nonprimary status. Marriage, per se, does not in any event disqualify a person from use of an apartment as a primary residence. Neither is it remarkable that two people living together require more space than one living alone.
Whether an apartment is a primary residence depends in common understanding on the use a tenant makes of it and the extent of her reliance on it for residential purposes. The uses which respondent makes of 3B are all of an ordinary residential nature. It is not maintained as a vacation residence, a weekend retreat, a pied-á-terre or a location exclusively or primarily dedicated to some specialized activity, e.g., a business or hobby. Neither is it kept in reserve for special purposes like the reception of overnight guests or as a play area for visiting children. Nor does it appear that respondent has ever sublet it.
Apartments 3B and I were separately rented, presumably as two primary residences. The fact that they were designed and constructed for separate use does not, in itself, preclude the two tenants from using them as one combined primary residence. Indeed, a single tenant may convincingly demonstrate primary use of a noncontiguous second apartment in the building. (Page Assocs. v Dolan, NYLJ, Nov. 8, 1984, at 4, col 2 [App Term, 1st Dept] [second apartment rented on the same floor so respondent’s nephew/ward could have his own bedroom]; Burgess v Campbell, NYLJ, July 29, 1981, at 7, col 4 [Sup Ct, NY County] [three additional apartments in the building rented over several years to accommodate growing family needs]; Tracy Assocs. v Faust, NYLJ, Apr. 15, 1987, at 14, col 2 [Civ Ct, NY County] [tenant of two-bedroom apartment renting additional one-bedroom apartment used as study, guest room, and storage area, spending a "fair amount of time there.” Held, a part of the primary residence]; see also, In re Gerald Syndicate, NYLJ, Oct. 8, 1975, at 6, col 2 [Sup Ct, NY County] [contiguous apartments rented together as a unit constitute a single primary residence].)
*499 An apartment in the next block, however, which was formerly tenant’s sole apartment and where tenant’s sister-in-law now resides is not his primary residence even if his wife and child spend time there daily. (Kassel v Bakst, NYLJ, June 2, 1986, at 7, col 2 [App Term, 1st Dept].) Neither is a noncontiguous apartment in the same building, once used as tenant’s primary residence but eventually devoted solely to business use. (Ter-Arutunian v Stahl Assocs. Co., NYLJ, Jan. 23, 1987, at 13, col 1 [Sup Ct, NY County].)
In the Page, Burgess, and Tracy cases (supra) the landlord was fully aware of the use to which tenant put the apartment and had acquiesced. Petitioner’s predecessor, in the present case, had been informed of respondent’s marriage, but details of the way she used the apartment may not have been revealed. And petitioner apparently never consented to this use.
The question, however, is not whether petitioner or a predecessor consented. The court’s sole inquiry is whether tenant occupies the apartment as her primary residence in fact. If she does not, petitioner’s right to terminate the tenancy would not be waived even by repeated renewal leases granted with full knowledge of the facts and even if such a lease permitted use of the apartment for professional purposes. (Ter-Arutunian v Stahl Assocs. Co., supra.) Conversely, if the tenant does in fact use the apartment as her primary residence, her tenure is protected by law regardless of the landlord’s knowledge of or consent to her particular life-style.
The suggestion that respondent hid her form of occupancy from petitioner by using her maiden name on rent checks and in the mailbox raises no issue. If indeed she did deceive petitioner, she obtained by that means only a benefit to which she was, in any event, entitled.
More convincingly petitioner argues, that in a time of scarce housing, no tenant should be allowed to retain two rent-controlled apartments as one primary residence. But the applicable statute does not provide for rationing. Neither does it address the issue of need. Desperation is not prerequisite to the occupation by a tenant of two apartments as one primary residence.
Nor does the present case raise the spectre of abuse. The stipulated facts imply no voluptuary excesses in the occupancy of rent-controlled space. Eleven hundred thirty-four square feet for a couple in Manhattan is comfortable but not lavish. *500 If respondent had not married Mr. Smith, their residence in the two apartments would never have been questioned. OHA-83 was not enacted to impose a marriage tax on living space.
This is not to say that there are no legal restraints on tenant’s greed for rent-regulated space. When the case is presented of a tenant’s selfish appropriation of vast expanses of living space for purposes of sybaritic excess or waste, that will be time enough to determine whether OHA-83 implies reasonable limits on the size of a "primary residence”.
Judgment for respondent.